MaddeN, Judge,
delivered the opinion of the court:
This is a suit for $53,287.50 of income taxes paid by plaintiff corporation for the year 1951. Plaintiff claims that it had a deductible expense of $105,000 for the year 1952, which was disallowed, and which, if it had been allowed, would have given it an operating loss for 1952, which it could have carried back to 1951. There is no dispute as to the right to the carryback, if the claimed 1952 deduction should have been allowed. The claimed deductible expense was a premium, an excess over the face value which plaintiff paid for the repurchase for retirement of its outstanding debentures.
The debentures in question were issued in 1941. Plaintiff then was and for many years had been operating a steamship line in freight and passenger service in the Chesapeake Bay. All of the plaintiff’s stock was owned by Seaboard Air Line Railway Company. There was a competing line, Chesapeake Steamship Company of Baltimore City, two-thirds of the stock of which was owned by Southern Railway Company and one-third by Atlantic Coast Line Railroad Company. Both the steamship lines were valuable adjuncts to the railway companies which owned them and which operated them in connection with their rail traffic.
The business depression which began in 1929 caused serious losses of revenue and operating losses to both steamship companies, but the losses of the plaintiff’s competitor, Chesapeake, were much greater than those of plaintiff. Although the two railroad owners of Chesapeake desired to have con *701 tinued steamship service on Chesapeake Bay, they were not willing after about 1937 to put any more money into their subsidiary, Chesapeake. Since there was not enough business to support two competing steamship lines, the three railroads began negotiations in 1938 looking toward the consolidation of the two steamship lines. An agreement, effective June 20, 1941, and approved in advance by the Interstate Commerce Commission, was made by the two steamship companies and the three railroads.
The agreement provided that the assets of Chesapeake should be transferred to the plaintiff and that Chesapeake would receive 50 percent of the capital stock of the plaintiff. Since the stock of Chesapeake was owned by Southern and Atlantic, those two railroads now owned, through Chesapeake, 50 percent of the stock of plaintiff. Under the agreement, three of the seven directors of plaintiff were to be representatives of Seaboard, three were to be representatives of Southern and Atlantic, and the seventh was to be the president of plaintiff but was to have no vote on the board of directors.
Because plaintiff’s properties, before the merger, were much more valuable than Chesapeake’s properties, the agreement provided that Seaboard, as the contributor of plaintiff’s properties to the merger, should receive, in addition to its 50 percent of plaintiff’s stock, $1,500,000 of bonds or debentures to be issued by plaintiff. The bonds were to run for 50 years, and were to bear interest at six percent during the years 1941 to 1955, and at diminishing rates thereafter. The approval of the agreement by the Interstate Commerce Commission provided that Seaboard could not transfer the debentures to anyone except Southern and Atlantic. The agreement provided that Southern and Atlantic, at their option, might purchase one-half the bonds from Seaboard at their face value.
Article II of the debentures provided that the debentures might be redeemed by plaintiff on any interest payment date by the payment of their face value, plus accrued interest. Between the time of the merger in 1941, and 1952 plaintiff accumulated surplus funds in a substantial amount. These funds were invested in United States Government bonds *702 yielding approximately two percent. For several years prior to 1952 the representatives of Southern and Atlantic on plaintiff’s board of directors wanted to use plaintiff’s surplus funds to redeem the debentures. Seaboard’s representatives were unwilling to do this, since the debentures were an excellent investment for Seaboard. They also urged that the proposed redemption would be in violation of the intent of the plan. In view of the make-up of the board of directors, the board was, of course, deadlocked on the question. On May 7, 1952 the board of directors and the stockholders approved the purchase of the debentures at a seven percent premium, i.e., the payment of $1,605,000 for the $1,500,000 of debentures. The parties then applied to the Interstate Commerce Commission for approval of their action, and received that approval on June 10, 1952. The debentures were then purchased, cancelled and retired by plaintiff. In plaintiff’s income tax return for 1952 it deducted the $105,000 as an ordinary and necessary business expense, and reported a net operating loss for the year, which it sought to carry back to the year 1951, for which year it had paid a tax. The deduction, and therefore the carryback, were disallowed, and this suit was brought.
Section 23(a)(1)(A) of the Internal Bevenue Code of 1939, as amended, 26 TT.S.C. (1952 ed.) § 23(a) (1) (A), provided that in computing net income there should be allowed as deductions:
All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *.
Treasury Begulations 118 § 39.22(a)-17 said:
Sale and purchase by corporation of its bonds.
(a) If bonds are issued by a corporation at their face value, the corporation realizes no gain or loss. If the corporation purchases any of such bonds at a price in excess of the issuing price or face value, the excess of the purchase price over the issuing price or face value is a deductible expense for the taxable year. If, however, the corporation purchases any of such bonds at a price less than the issuing price or face value, the excess of the issuing price or face value over the purchase price is gain or income for the taxable year.
*703 This regulation was in accord with prior regulations and judicial decisions. Great Western Power Co. of California v. Commissioner, 297 U.S. 543, 546.
A payment by a corporation which qualifies otherwise as a deductible expense is not rendered non-deductible because it is made to a director or to a controlling stockholder. Brown Printing Co. v. Commissioner, 255 F. 2d 436 (CA5), (rent paid to stockholder). Mertens, Law of Federal Income Taxation, § 25.81 cites cases of salaries paid to stockholders. Where payments are made to controlling stockholders, it is necessary to scrutinize the transaction to make certain that the payments are reasonable in amount, since the transaction is not at arm’s length.
It would seem that the cost of the redemption of the plaintiff’s debentures was deductible, under the statute and the regulations. The 1941 agreement was an arm’s length agreement between Seaboard on the one hand and Southern and Atlantic on the other. It gave to Seaboard, in return for its greater contribution to the assets of the merged corporation, debentures which proved to be a desirable permanent investment. Because of the equal representation on the board of directors of plaintiff, and the consequent deadlock on the question of redemption, the compromise reached was also an arm’s length compromise. It was the least that Seaboard, the owner of the debentures, was willing to sell them for, and the plaintiff had its choice of either continuing to pay the six percent interest on them or paying the demanded price for them. That the purchase was prudent is shown, not only by the fact that Southern and Atlantic, parties with interests adverse to Seaboard, agreed to it, but by the fact that the Interstate Commerce Commission approved it as not impairing the plaintiff’s capacity to render service as a public utility.
The Supreme Court of the United States said in Deputy v. Du Pont, 308 U.S. 488, 495, “Ordinary has the connotation of normal, usual, or customary.” It is normal for a corporation to buy back its bonds at a premium if it can thereby effect a saving in interest. An expense is necessary if it is appropriate and helpful to the taxpayer’s business. Welsh v. Helvering, 290 U.S. 111, 113. The taxpayer’s *704 judgment as to what is appropriate and helpful to its business should not be overruled by the taxing authorities or the courts without good reason. Mertens, op. cit., supra, § 25.09.
The Government points out that plaintiff had the right to redeem its debentures at par and that it was obliged to pay the premium only because of the obstinacy of Seaboard’s representatives on plaintiff’s board of directors. It cites Olinger Mortuary Assn. v. Commissioner, 23 B.T.A. 1282, to the effect that amounts paid to a disgruntled minority stockholder to secure his acquiescence in transactions which he does not approve, are not deductible. With deference, it seems to us that a disgruntled minority stockholder may be a fact of life, and if it is necessary, in order to accomplish the proposed corporate action, and is prudent and advantageous to the interests of the corporate taxpayer, to secure his acquiescence, an expenditure for that purpose may well be deductible.
Plaintiff is entitled to recover and judgment will be rendered to that effect. The amount of recovery will be determined pursuant to Buie 38 (c).
It is so ordered.
Beed, Justice (Bet.), sitting by designation; LittletoN, Judge {Bet.); Laramore, Judge; and Jones, Chief Judge, concur.
Whitaker, Judge, took no part in the consideration and decision of this case.
FINDINGS OP PACT
The court, having considered the evidence, the report of trial commissioner W. Ney Evans, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, Baltimore Steam Packet Company is, and at all times pertinent to this proceeding was, a corporation organized and existing under the laws of the State of Maryland, presently maintaining its principal office and place of business at Pier 3, Pratt Street, Baltimore, Maryland.
2. During the year 1951, and prior and subsequent thereto insofar as pertinent to this proceeding, plaintiff was and has *705 been, engaged in the operation of a steamship line in the freight and passenger service in Chesapeake Bay and its tributary streams, subject to the regulating provisions of Part hi of the Interstate Commerce Act.[1]
3. At all times pertinent to this proceeding, plaintiff has kept its books and filed its Federal income tax returns on the accrual basis of accounting and has been on a calendar year basis for tax and other purposes.
4. On June 16, 1941, plaintiff entered into a Plan Agreement, effective June 20, 1941, with the Chesapeake Steamship Company of Baltimore City (hereinafter referred to as Chesapeake), Atlantic Coast Line Railroad Company (hereinafter referred to as Atlantic), Southern Railway Company (hereinafter referred to as Southern), and the Receivers of Seaboard Air Line Railway Company (hereinafter referred to as Seaboard), whereby the plaintiff acquired all the properties, assets and business of Chesapeake Steamship Company of Baltimore City.[2]
5. Prior to the effective date of the Plan Agreement, Seaboard owned all of the capital stock of the plaintiff. Under the provisions of the Plan Agreement, Seaboard transferred 50 percent of the capital stock of the plaintiff to Chesapeake and acquired $1,500,000 principal amount of 6 percent-4% percent income debentures (hereinafter referred to as debentures) issued by the plaintiff in accordance with the Plan Agreement. Seaboard retained 50 percent of the capital stock of the plaintiff, and Seaboard or its successor, Seaboard Air Line Railroad Company (hereinafter referred to as Seaboard Railroad), has since continuously owned such capital stock.[3]
6. (a) The debentures were issued by the plaintiff pursuant to the authorization of the Interstate Commerce Commission given in Finance Docket 13100,[4] decided April 15, 1941.
*706 (b) Tbe Plan. Agreement provided in part as follows:
4. Packet Company agrees:
(a) That upon the effective date of the Plan * * * Packet Company will issue and deliver to Chesapeake $900,000 principal amount of * * * Debentures * * * to be issued substantially in the form and on the terms and conditions, set forth in Exhibit D hereto attached * * *.
(b) That, prior to the delivery of Debentures as provided in the preceding subsection (a) * * * Packet Company * * * will declare and pay [for the benefit] of Seaboard Air Line Kailway * * * a dividend in the amount of $600,000 payable by $600,000 principal amount of Debentures * * * issued * * * upon the same terms and conditions as the Debentures referred to in * * * subsection (a) * * *.
1. Chesapeake agrees: * * *
(j) That upon the effective date of the Plan and upon the delivery to it of $900,000 principal amount of Debentures * * *, Chesapeake will transfer and deliver all of said Debentures to or upon the order of the Seaboard Deceivers in exchange for shares representing 50% of the capital stock of the Packet Company.
(c) The Plan Agreement further provided in part:
10. A. Southern and Atlantic jointly shall have the option and right to purchase, either directly or through Chesapeake, an aggregate of not exceeding $750,000 principal amount of the Debentures * * * in accordance with the following terms and procedure:
Upon receipt by the Packet Company from Southern and Atlantic or from Chesapeake of an offer in writing to purchase a specified amount of Debentures * * *, pursuant to the option granted in this section, accompanied by an amount in cash equal to the redemption price of the Debentures offered to be purchased, the Packet Company shall call for redemption * * * and shall redeem out of said cash, Debentures * * * in the amount * * * specified in such offer, at the price and in accordance with the provisions for redemption set forth in the Debentures. * * *
(d) Exhibit D attached to the Plan Agreement contained the Form of Debenture, including the following provisions:
Article i. * * * 1. All the debentures shall rank pari j?assu without preference, priority or distinction as to anv one debenture over or from any other by reason *707 of priority in tbe issuance or negotiation thereof or otherwise.
Article ii. * * * 1. The debentures may be redeemed, at the option of the Company, as a whole or, to the extent herein permitted, in part, on any interest payment date prior to maturity * * * at the principal amount thereof and * * * interest * * * (the aggregate of which principal and interest is hereinafter referred to as “the redemption price”).
7. Prior to the effective date of the Plan Agreement, two-thirds of the capital stock of Chesapeake was owned by Southern and one-third was owned by Atlantic. Such stock has since been continuously so owned. Thus, after the adoption of the Plan Agreement, the remaining 50 percent of the plaintiff’s stock was controlled by Southern and Atlantic through their ownership of all of the Chesapeake stock.
8. At all times pertinent to this proceeding, the board of directors of the plaintiff, in accordance with the Plan Agreement and the plaintiff’s by-laws, was composed of seven members, three of whom were designated by Seaboard Railroad, two by Southern, and one by Atlantic, while the seventh director was plaintiff’s president, who had no power to vote.
9. (a) For several years prior to 1952, conferences were held between the representatives of the plaintiff’s stockholders for the purpose of deciding whether the outstanding debentures should be called. Such conferences resulted in an absolute deadlock between the Seaboard Railroad on the one side and Southern and Atlantic on the opposite side. Southern and Atlantic wanted the debentures called so that interest payments accruing thereon would be discontinued. Seaboard Railroad did not want the debentures called because they represented an excellent investment yielding 6 percent interest. Three of the plaintiff’s directors (from Southern and Atlantic) were firmly convinced that the debentures should be called, and three of the directors (from Seaboard Railroad) were just as firmly convinced that the debentures should not be called.[5] Since the seventh director *708 (plaintiff’s president) had no vote, this situation left the plaintiff helpless to exercise its option under the Plan Agreement to call the debentures for redemption.
(b) In order to break the deadlock between the six voting members of the plaintiff’s board of directors, those members who represented Southern and Atlantic proposed that the plaintiff should buy the entire $1,500,000 principal amount of the debentures from Seaboard Railroad. Sometime prior to April 1, 1952, the terms and conditions of a purchase of such debentures by the plaintiff from Seaboard Railroad were negotiated between representatives of the plaintiff, of Southern, of Atlantic, and of Seaboard Railroad.
(c) On April 1, 1952, at a regular monthly meeting of the board of directors of Seaboard Railroad held in New York City, resolutions were adopted that read in part as-follows:
Resolved, that the President of the Company be, and he hereby is, authorized and empowered to negotiate with Baltimore Steam Packet Company for the sale to it for retirement and cancellation of the $1,500,000 principal amount of its Income Debentures due January 1,, 1991, at such price, not less than the principal amount thereof, plus accrued interest from January 1, 1952, to-the date of purchase, as the President of this Company shall approve; and
eurther resolved, that, subject to any necessary approval of the Interstate Commerce Commission, the proper officers of this Company be, and they hereby are,, authorized and empowered to take all action and to execute and deliver all documents or other instruments, necessary or convenient and proper, in order to effect such sale of said Debentures at such price as shall be approved by the President as foresaid; and
eurther resolved, that Mercantile Trust Company of Baltimore and Nelson PI. Stritehoff, the Trustees under the First Mortgage of this Company, and Guaranty Trust Company of New York and Arthur E. Burke, the *709 Trustees under the General Mortgage of this Company,, both dated as of January 1, 1946, be, and they hereby are, requested to release the said Debentures, when so-sold by this Company, from the respective liens of the-said Mortgages under which they are Trustees, respectively, upon payment to the Corporate Trustee of the-First Mortgage of all cash received from the sale of* such Debentures; and
further resolved, that this Company, as a stockholder of Baltimore Steam Packet Company, hereby-consents to the purchase by it for retirement and cancellation of the $1,500,000, principal amount of its Income Debentures, at such price, not less than the-principal amount thereof, plus accrued interest from January 1, 1952, to the date of purchase, as shall be-approved by the President of this Company.
(d) At a special meeting on May 7, 1952, the plaintiff’s, board of directors adopted certain resolutions which were-ratified and confirmed later in the same day at a regular-annual meeting of its stockholders at which all of its outstanding shares of stock were represented in person or by-proxy. Such resolutions provided in part as follows:
resolved: That, subject to the unanimous approval! of the stockholders of this Company, the Board of Directors hereby authorizes and approves the purchase on or before July 1,1952, by this Company for cancellation, and retirement, of the $1,500,000 principal amount of its-Income Debentures due January 1, 1991, at a price of 107, aggregating $1,605,000, plus interest at the rate of 6% per annum on the principal amount, from January-1, 1952 to date of purchase, from Seaboard Air Line-Railroad Company; and
further resolved : That, subject to the unanimous approval of the stockholders of this Company, the proper-officers of this Company be, and they hereby are, authorized and empowered and directed to take all action necessary or convenient and proper, in order to effect such:, purchase, including the sale of such amount of Government securities owned by this Company as, in the opinion, of the President, would be necessary in order to effect such purchase; and
further resolved : That immediately upon such purchase of said Debentures, they shall be thereupon retired, and cancelled, and no Debentures shall be issued in lieu, thereof.
*710 10. (a) On May 9,1952, in accordance with the resolution of its board of directors of April 1,1952, Seaboard Railroad filed with the Interstate Commerce Commission a supplemental application in Finance Docket 13100 for an order in respect of the sale to the plaintiff of the $1,500,000 principal amount of income debentures due January 1, 1991, which the plaintiff had issued in accordance with the Plan Agreement approved by the Commission in its order and report of April 15, 1941. Such supplemental application (to which were attached copies of the resolutions from which excerpts appear in the preceding paragraph) included a statement that all such debentures were then held by Seaboard Railroad but pledged under its first mortgage and junior thereto under its general mortgage, both dated as of January 1,1946, to and in the possession of the Mercantile Trust Company of Baltimore as corporate trustee under such first mortgage. Such application also stated that Seaboard Railroad then owned 50 percent of the capital stock of the plaintiff and that the remaining 50 percent was owned by Chesapeake whose capital stock was wholly owned by Southern and Atlantic.
(b) Such supplemental application requested that the Commission: (a) issue an order supplemental to its aforesaid order of April 15, 1941, authorizing applicant to sell said $1,500,000 aggregate principal amount of debentures, and Baltimore Steam Packet Company to purchase the same from applicant, for retirement and cancellation on or before July 1,1952; (b) modify its aforesaid order of April 15,1941, so as to authorize said transaction; or (c) in the alternative, find that no such order by the Commission was necessary in order for applicant to sell, and Baltimore Steam Packet Company to purchase from applicant, the said $1,500,000 aggregate principal amount of debentures, for retirement and cancellation on or before July 1,1952.
11. Thereafter, on June 10, 1952, a supplemental order in Finance Docket 13100 was entered[6] by the Commission modifying its condition imposed on the issuance of the debentures to the extent necessary to permit Seaboard Railroad to sell and the plaintiff to purchase for retirement and cancellation *711 on or before July 1,1952, tbe entire principal amount of tbe debentures. Tbe Commission’s report said in part:
On May 9,1952, tbe Seaboard Air Line Railroad Company filed a petition requesting that we (a) issue an order supplemental to our order of April 15, 1941, authorizing the petitioner to sell and the Baltimore Steam Packet Company to purchase for retirement and cancellation on or before July 1,1952, tbe entire $1,500,000 principal amount of tbe debentures in question, or (b) modify our order of April 15, 1941, so as to authorize the transaction, or (c) in tbe alternative find that no order by us is necessary for tbe sale of such debentures by tbe petitioner for tbe purpose stated. The petitioner asserts that the Baltimore Company is paying 6-percent interest on the debentures, whereas it owns Government securities on which it is receiving less than 2 percent. It is planned that the money now invested in the latter will be used for the purchase and retirement of the debentures at a price of 107, total amount $1,605,000, plus interest at 6 percent from January 1,1952, to date of purchase.
While the petitioner is of the opinion that the purpose of our condition was to forbid disposition of the debentures as live, interest-bearing obligations, to an outside party and not to prevent the purchase thereof by the Baltimore Company for retirement and cancellation, it points out that the language used is broad enough to require our further authority, and for that reason such authority is requested. By letters dated May 9,1952, the Chesapeake Steamship Company of Baltimore City, the Atlantic Coast Line Railroad Company, and the Southern Railway Company have advised us that they do not desire to exercise their option to purchase, either directly or indirectly the $750,000 principal amount of the debentures of the Baltimore Company now held by the Seaboard. All necessary corporate action has been taken in the premises.
In our opinion a modification of the condition attached to our previous order is required in the public interest.
12. The authorized purchase of its debentures from Seaboard Railroad was made by the plaintiff during the year 1952 at the agreed price of $1,605,000 in cash from surplus funds that were invested in United States Government Bonds then yielding approximately 2 percent, thereby effecting a saving to the plaintiff of interest on the debentures at the rate of 4 percent. Such debentures were canceled and retired.
*712 13. On March 13, 1953, the plaintiff filed its 1952 Federal corporation income tax return reporting thereon a net loss of $133,179.31 which included the amount of $105,000 as an ordinary and necessary business expense incurred by the plaintiff during 1952 in the purchase of its debentures from Seaboard Eailroad. In a subsequent audit of the plaintiff’s-tax return the item of $105,000 was disallowed in full, and the net loss claimed thereon was reduced to $28,179.31. This: amount was allowed as a net operating loss carryback from 1952 to 1951 and is not now in controversy.
14. The plaintiff also duly filed its 1951 Federal corporation income tax return upon which a total corporation income-tax liability of $134,983.90 was timely assessed and paid during 1952 in quarterly installments of $47,212.87 on March 15- and on June 16, and of $20,234.08 on September 15 and on December 15.
15. The plaintiff timely filed a formal claim for refund of $67,588.50 of the tax paid for 1951, and therein claimed a carryback of a net operating loss of $133,179.31 from the year 1952 to 1951. Such refund claim was allowed in part in an amount of $14,301 based upon a carryback of $28,179.31 from 1952 to 1951 and the balance of the claim was disallowed with statutory notice to the plaintiff in a letter dated January-11, 1957.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part' of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment will be-entered to that effect. The amount of recovery will be deter- ■ mined pursuant to Eule 38(c).
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount' due thereunder, it was ordered on April 15, 1960, that judgment for the plaintiff be entered for $53,287.50, with interest', thereon as provided by law.

 54 Stat. 929, 49 U.S.C. (1952 ed.), §§ 901-923.

 until June 20, 1941, Chesapeake was also engaged In the operation of a steamship line in the freight and passenger service in Chesapeake Bay and its tributary streams.

 Seaboard Railroad acquired the stock in 1946 upon the reorganization of Seaboard.

 244 I.C.C. 583, 603.

 In the opinion of the Seaboard Railroad representatives, it had been understood in the negotiations leading to the Plan Agreement that as long as all of the debentures were in the hands of Seaboard they would not be called by *708 plaintiff except in order to transfer them to the Southern and Atlantic pursuant to section 10 of the Plan Agreement. Therefore, to call the debentures-for cancellation would, in the view of Seaboard Railroad’s representatives, have been contrary to the purpose for which the debentures were authorized and issued (which purpose was to give Seaboard a prior charge on the earnings by reason of its greater contribution to the consolidated company), and* would have violated the understanding of the parties in the negotiations leading to the Plan Agreement.

 282 I.C.C. 536.